IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 10-cv-02126-WDM-KLM

CONTINENTAL WESTERN INSURANCE COMPANY, an Iowa corporation,

      Plaintiff,

v.

SHAY CONSTRUCTION, INC., a Colorado corporation,
MILENDER WHITE CONSTRUCTION COMPANY, a Colorado corporation,

      Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

Miller, J.

      This case is before me on the Motion for Summary Judgment (ECF No. 30) filed by Plaintiff Continental Western Insurance Company ("Continental Western").  Defendants Shay Construction, Inc., ("Shay") and Milender White Construction Company ("Milender White") oppose the motion.  I have reviewed the parties' written arguments and the evidence submitted with their briefs.  For the reasons that follow, the motion will be granted.

Background[1]

      This is coverage dispute on a contract of insurance.  The underlying facts are relatively simple and the primary issues are a matter of contract interpretation and application.

      Milender White is the general contractor on a major construction project in Grand

---

[1]The following facts are taken from the parties' briefs and attached exhibits and are undisputed unless otherwise noted.

County, Colorado.  In early 2008, Milender White entered into three subcontracts with Shay under which Shay agreed to provide framing, siding, and related work on the project.  Shay was insured by a commercial general liability insurance policy issued by Continental Western (the "Policy") until the Policy was cancelled for non-payment around April 27, 2009.

Two subcontractors of Shay, Wood Source Inc. and Chase Lumber Company furnished materials, labor, and equipment to Shay in connection with the project.  These subcontractors filed a lawsuit (the "Underlying Lawsuit") in the state district court alleging they had not been compensated for the work and materials and seeking to enforce mechanics' liens.  Milender White and Shay were named as defendants.  In its answer to the complaint in the Underlying Lawsuit, Milender White asserted cross claims against Shay, alleging that Shay had breached its obligations under its subcontracts with Milender White.  Shay seeks coverage under the Policy for defense costs and damages in the litigation of Milender White's cross claims.

According to the allegations in the cross claims, Shay materially breached the subcontracts in the following manner:

    a.    Failing and/or refusing to comply with scheduling requirements applicable to the Subcontract, including specific milestones agreed to during construction;

    b.    Failing and/or refusing to meet recovery schedules and revised milestone dates agreed to during construction, which were generated in an effort to mitigate or overcome prior delays on the Project;

    c.    Failing and/or refusing to provide the necessary level, skill and quality of workmen to timely and satisfactorily complete its scope of work on the Project;

d.      Failing and/or refusing to provide the required full time level and effective quality of supervision for its scope of work;

e.      Failing and/or refusing to perform its work to the quality standards and requirements of the Subcontract and Contract Documents;

f.      Failing and/or refusing to satisfactorily address items of noncompliance and poor quality work identified on deficiency logs and through other correspondence of Milender White;

g.      Failing and/or refusing to follow required safety procedures and failing to implement and maintain safe working conditions during construction;

h.      Performing defective work, not in compliance with the requirements of the Subcontract and Contract Documents, and failing and/or refusing to correct deficiencies despite notice and demand from Milender White;

i.      Failing and/or refusing to cooperate with Milender White and other trade subcontractors in the interests of timely and satisfactorily completing the Project;

j.      Damaging the work of other trades in correcting deficiencies in its own performance; and

k.      Failing and/or refusing to pay its lower-tiered subcontractors and suppliers in violation of its Subcontract with Milender White[;]

l.      Failing and/or refusing to hold harmless and indemnify Milender White from claims from Shay's lower tiered subcontractors and suppliers in violation of its Subcontract with Milender White.

Amended Answer of Milender White in Underlying Action, Exh. B to Pl.'s Mot. for Summ.

J., ECF No. 30-2, ¶ 7.  As a result, Milender White alleges it was required to implement

remedial and corrective measures to address Shay's performance deficiencies, including

hiring additional framing subcontractors, addressing safety issues, and correcting and repairing Shay's defective work. *Id.*, ¶¶ 8, 12. Milender White further alleges that it has incurred expenses in defending against the claims and liens against the project. *Id.*, ¶ 13.

Continental Western thereafter filed its complaint in this lawsuit seeking declaratory judgment that the Policy does not cover the dispute between Shay, its subcontractors, and Milender White, particularly the cross claims asserted by Milender White against Shay. It seeks summary judgment on the issue, arguing that the terms of the Policy do not include and/or expressly exclude coverage for the damages incurred by Milender White. Shay filed counterclaims against Continental Western alleging breach of contract, bad faith breach of insurance contract, and statutory bad faith under C.R.S. §§ 10-3-1115 and 1116. Continental Western seeks summary judgment on Shay's counterclaims on the grounds that Shay is not entitled to a defense or indemnity in the Underlying Lawsuit as a matter of law.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

## Discussion

1.   Applicable Law

Jurisdiction in this matter is based on diversity. 28 U.S.C. § 1332. Therefore, as the parties agree, I apply the law of Colorado in resolving the issues. *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1287 (10th Cir. 2006).

4

"An insurance policy is a contract which should be interpreted consistently with the well settled principles of contractual interpretation." *Chacon v. American Family Mut. Ins. Co.,* 788 P. 2d 748, 750 (Colo. 1990). Words in the policy should be given their plain and ordinary meaning unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended. *Id.* If a contractual provision is ambiguous, that is, if it is reasonably susceptible to different meanings, it must be construed against the drafter and in favor of providing coverage to the insured. *Id.* Exclusions and limitations on coverage are to be given a narrow construction. *Am. Family Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 953 (Colo. 1991).

An insurer seeking to avoid a duty to defend has a "heavy burden." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999). If the insurer claims that coverage does not exist because of an exclusion, the insurer "must establish that the exemption claimed applies in the particular case, and that the exclusions are not subject to any other reasonable interpretation." *Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083, 1090 (Colo. 1991). "An insurer is not excused from its duty to defend unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured." *Id.* The duty to defend is determined by looking at the allegations of the underlying complaint against the insured and extrinsic evidence is not to be considered. *Compass*, 984 P.2d at 615. Nonetheless, ambiguity should be determined based on the facts and circumstances presented in a particular case. *TerraMatrix, Inc. v. United States Fire Ins. Co.,* 939 P.2d 483, 487 (Colo. App. 1997). My interpretation of an insurance contract is a matter of law. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003).

2.     <u>The Policy</u>

A copy of the Policy is provided.  Exh. D to Pl.'s Mot. for Summ. J., ECF No. 30-4.

Section I of the Policy contains coverages and exclusions.  The insuring agreement states

"We will pay those sums that the insured becomes legally obligated to pay as damages

because of 'bodily injury' or 'property damage' to which this insurance applies."  *Id.* Sec.

I, ¶ 1(a).  It further provides that coverage is available only if the injury or damage is caused

by an "occurrence."  *Id.* Sec. I, ¶ 1 (b)(1).  "Occurrence" is defined as "an accident,

including continuous or repeated exposure to substantially the same general harmful

conditions."  *Id.* Sec. V, ¶ 13.

The Policy also includes several exclusions.  The exclusions relevant here are as

follows:

> (b) Contractual Liability
> "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages: (1) That the insured would have in the absence of the contract or agreement . . .
>
> * * *
>
> (j) Damage to property
> "Property damage" to: . . . (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. . . . Paragraph (6) of this exclusion does not apply to "property damage" included in the "products completed operations hazard."
>
> * * *
>
> (l) Damage To Your Work

6

> "Property damage" to "your work" arising out of it or any part of
> it and included in the "products completed operations hazard."
> This exclusion does not apply if the damaged work or the work
> out of which the damage arises was performed on your behalf
> by a subcontractor.

*Id.* Sec. I, ¶ 2.

"Your work" is defined as "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations." *Id.* Sec. V, ¶ 22 (a).   The definition also includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work' . . ." *Id.* Sec. V, ¶ 22(b).

Finally, the "products-completed operations hazard" is defined in relevant part as follows:

> Includes all "bodily injury" and "property damage" occurring
> away from premises you own or rent arising out of . . . "your
> work" except . . . Work that has not yet been completed or
> abandoned [with additional explanation of what may constitute
> completion or abandonment].  Work that may need service,
> maintenance, correction, repair or replacement but which is
> otherwise complete will be treated as completed.

*Id.* Sec. V, ¶ 16(a).

3.   <u>Scope of Insuring Clause</u>

Continental Western first argues that Milender White's claims against Shay all arise from contract and therefore do not adequately allege the type of damages that triggers coverage under the insuring agreement.  Continental Western argues that the insuring clause, including the phrase "those sums that the insured becomes legally obligated to pay as damages," applies only to damages resulting from tort actions, not claims of breach of contract.  Continental Western concedes that the state courts in Colorado have not yet

7

addressed this issue but cites law from other jurisdictions for this principle.  Given that the Colorado courts have not spoken on this issue, and the phrase "legally obligated to pay" is arguably ambiguous as to whether it encompasses a legal obligation arising from contract, I must construe this ambiguity against the insurer and decline to give it the reading that Continental Western requests.  I therefore turn to Continental Western's other arguments in this regard.

Continental Western next argues that the allegations in the underlying lawsuit do not show property damage resulting from an "occurrence," which is required for coverage.  As noted above, "occurrence" is defined as an "accident."  I agree with Continental Western that a significant portion of the cross claims allege the failure to provide services as promised in a contract, not property damage resulting from an accident.  The only property damage alleged is Shay's defective work and damage to the work of other trades resulting from the repair of Shay's deficient work.  This raises the question, then, of whether this would be considered an accident pursuant to the Policy.

Continental Western cites a number of cases in support of the proposition that poor workmanship is generally not a covered occurrence under a general commercial liability policy.  It relies in particular on a recent Colorado state court case discussing exactly this issue, *General Security Indemnity Co. of Arizona v. Mountain States Mutual Casualty Co.*, 205 P.3d 529 (Colo. App. 2009).

The *General Security* case involved alleged defects in the construction of homes at a residential subdivision.  At issue were commercial general liability ("CGL") policies containing a definition of "occurrence" identical to the one at issue here.  The division of the Colorado Court of Appeals noted that the term "accident" has previously been defined as

8

"an unanticipated or unusual result flowing from a commonplace cause." *General Security*, 205 P.3d at 534. The division adopted the position of a majority of jurisdictions in holding that "a claim for damages arising from poor workmanship, standing alone, does not allege an accident that constitutes a covered occurrence, regardless of the underlying legal theory pled." *Id.* at 534.  However, the division noted that this principle has a "corollary," which is that "an 'accident' and 'occurrence' are present when consequential  property damage has been inflicted upon a third party as a result of the insured's activity." *Id.* at 535.  Because all of the damage alleged was to the homes themselves, the division determined that there was no "occurrence" triggering coverage. *Id.* at 537-38.

In another case in this Court, my colleague Judge Marcia Krieger applied the *General Security* case to further refine the "corollary" principle. *Greystone Constr., Inc., v. Nat'l Fire & Marine Ins. Co.,* 649 F. Supp. 2d 1213 (D. Colo. 2009).  Specifically, she determined that "'damage inflicted on a third party' necessary to invoke the corollary refers to faulty workmanship causing property damage to something *other than* the work product itself." 649 F. Supp. 2d at 1218 (emphasis in the original).  Therefore, if the insured's poor workmanship resulted in damage to something other than the work product, such damage could constitute an "occurrence" under a similar CGL policy.

The Colorado General Assembly has acted to overrule the effect of the *General Security* case by enacting House Bill 10-1394, signed into law on May 21, 2010.  C.R.S. § 13-20-808.  The statute addresses some of the issues raised in *General Security* and provides, *inter alia*, that when considering commercial liability policies issued to construction professionals "a court shall presume that the work of a construction professional that results in property damage, including damage to the work itself or other

9

work, is an accident unless the property damage is intended and expected by the insured." C.R.S. § 13-20-808(3).  The statute applies to all insurance policies in existence as of, or issued on or after May 21, 2010, the effective date of the law.  Laws 2010, Ch. 253, § 3. It is undisputed that the Policy here was not in force on May 21, 2010, having been cancelled nearly a year earlier.  I therefore do not apply the presumption of HB 10-1394.

Nonetheless, I conclude that, even if I apply the principles of *General Security*, the cross claims might allege an occurrence under the Policy under the corollary because of the contention that Shay's defective work required repair that resulted in damage to the work product of other trades.  This shows not only poor workmanship but also damage to a third party as a result, which arguably brings the allegations of the cross claims within the scope of the insuring agreement.

4.   Exclusions

Continental Western nevertheless argues that even if the insuring clause provides coverage, it is thereafter revoked by Exclusion (j)(5), which bars coverage for damage to "That particular part of real property on which you . . . are performing operations, if the 'property damage' arises out of those operations."   Alternatively, Continental Western contends that Exclusion (j)(6), which bars coverage for "That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it," applies in these circumstances.  Exclusion (j)(6) expressly does not apply to damage included in the "products-completed operation hazard," which concerns damage occurring when the insured's work is "completed," as defined by the policy.

Exclusions like (j)(5) and (j)(6) are described as "faulty workmanship" provisions. *McGowan v. State Farm Fire & Cas. Co.,* 100 P.3d 521, 525 (Colo. App. 2004).  In general,

10

CGL policies exclude coverage for faulty workmanship on the grounds that it is considered a business risk to be borne by the insured. *Id.* A CGL policy is "not intended to serve as a performance bond or a guaranty of goods or services." *Hartford Acc. & Indem. Co. v. Pacific Mut. Life Ins. Co.*, 861 F.2d 250, 253 (10th Cir. 1988). Exclusion (j)(5) generally applies when work is in progress and focuses on the area on which the insured is performing work; Exclusion (j)(6), on the other hand, focuses on the repair of that work and expressly does not apply if the work has been completed[2]. The distinction between Exclusions (j)(5) and (j)(6) has been explained in the following way:

> When the work is currently being performed by the contractor, it should be readily apparent whether the work is being performed appropriately. If the contractor fails to remedy faulty work, it clearly would comprise a business risk [and should be excluded under exclusion (j)(5)]. In contrast, when the work is completed and accepted, but a latent defect later gives rise to a loss, there is clearly an element of fortuity that should be covered by insurance.

Robert J. Franco, Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies, 30 Tort & Ins. L.J. 785, 798 (Spring 1995). An example of the latter situation would be a contractor building a house and first erecting the walls and installing the roof. *Id.* at 797. After the roof is installed, the contractor begins working on the interior. *Id.* The roof, however, was defectively installed and later leaks, causing damage to the partially completed floors. *Id.* Exclusion (j)(6) would bar coverage for costs

---

[2]Interpreting a similar CGL policy with an identical faulty workmanship provision, the Tenth Circuit concluded that the exclusion was intended to exclude property damage "that directly or consequentially occurs from faulty workmanship of the insured and its contractors/subcontractors (i.e., work that 'was incorrectly performed') while the work is ongoing." *Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1012 (10th Cir. 2006).

11

incurred in repairing or replacing the roof, but the cost of repairing the floors would be covered. *Id.*

The allegations recite that Milender White gave notice to Shay of the deficiencies during construction and that Shay damaged the work of other trades while repairing its own work. Amended Answer of Milender White in Underlying Action, Exh. B to Pl.'s Mot. for Summ. J., ECF No. 30-2, ¶¶ 7(j), 10. This strongly suggests that the property damage arose at the time that Shay was performing its work, rather than being the result of some kind of fortuity resulting from a latent defect in the work. Both Exclusions (j)(5) and (j)(6) apply to damage occurring while the insured's work is ongoing.

Exclusion (j)(5) bars coverage for property damage to "That particular part of real property on which you . . . are performing operations, if the 'property damage' arises out of those operations." I conclude that this exclusion would apply to both Shay's allegedly defective work and the damage Shay allegedly caused to the work of other trades when it repaired its own work. The exclusion applies to the part of real property on which Shay is performing operations if the damage "arises out of" those operations. This language is broad enough to include not only work Shay was hired to do but any area Shay damaged while performing its operations, including repair work. The cross claims clearly allege that Shay <u>itself</u> damaged the work of other trades when it corrected deficiencies in its own performance. Even if I give the language of this exclusion a narrow construction, I conclude that it encompasses property damage arising out of Shay performance of its work, including its own faulty workmanship and damage it caused to other work areas from its efforts to repair its own work.

Similarly, Exclusion (j)(6) bars coverage for "That particular part of any property that

must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  Shay argues that this exclusion does not include damage to the work of other trades and may not apply because the damage could have occurred after Shay's work was completed, thereby invoking the products-completed operations hazard language.  Milender White also argues that the exclusion language limits such damage to only the specific part of the property that Shay actually performed its work, not the surrounding areas involving other trades.  Again, I disagree.  As noted above, the Policy defines "your work" as any "work or operations performed by you or on your behalf."  Again, this is broad enough to include both Shay's defective work and the damage it inflicted directly on other work in its repair of its poor workmanship, what Continental Western has called "tear out costs."  I agree with the authority holding that such costs are generally excluded.  *See, e.g., Gen. Accident Ins. Co. v. Am. Nat'l Fireproofing, Inc.*, 716 A.2d 751, 758-59 (R.I. 1998); *see also H.E. Davis & Sons, Inc., v. North Pacific Ins. Co.*, 248 F. Supp. 2d. 1079, 1085-86 (D. Utah 2002).

In summary, the allegations in Milender White's cross claims assert either breach of contract claims that do not involve property damage, and so are not within the insuring clause of the Policy, or they allege property damage that is excluded by Exclusions (j)(5) and/or (j)(6).  I see no other claims that are even arguably within the scope of the Policy's coverage.  Under the circumstances, therefore, Continental Western's duty to defend Shay was not triggered.

Accordingly, it is ordered:

1.     Continental Western's Motion for Summary Judgment (ECF No. 30) is granted.  Judgment shall enter in favor of Continental Western on all its

claims and against Shay Construction on Shay's counterclaims.

2.      Continental Western may have its costs.

DATED at Denver, Colorado, on July 28, 2011.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge